# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 4, 2016

## IN RE: EDDIE F., ET AL.

### Direct Appeal from the Juvenile Court for Sullivan County
### No. J41108     Mark Toohey, Judge

---

### No. E2016-00547-COA-R3-PT-FILED-DECEMBER 2, 2016

---

This appeal involves the termination of a mother's parental rights to her four children by two different fathers. Mother contested the termination, but the fathers ultimately did not. The trial court found by clear and convincing evidence that several grounds for termination exist and that termination is in the best interests of the Children. The mother appeals. For the following reasons, we reverse the trial court's finding that Mother abandoned her children by failing to provide a suitable home. We also reverse the trial court's finding that Mother failed to substantially comply with the requirements of her permanency plans. However, we conclude that there is clear and convincing evidence to support the other grounds for termination relied upon by the trial court and that the termination of Mother's parental rights is in the Children's best interest.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in part, Affirmed in part, and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Elizabeth Alexander Brady, Sevierville, Tennessee, for the appellant, Latasha A.

Herbert H. Slatery III, Attorney General and Reporter, and Alexander S., Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Daniel J. Cantwell, Guardian Ad Litem.

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Appellant, Latasha A.[1] ("Mother") is the mother of four young children: Eddie F., born April 2008, Emily F., born January 2010, Bralynn F., born January 2012, and Bryan F., born January 2013. Eddie F., II is the father of the older two children, Eddie F. and Emily F., and Jonathon F. is the father of the younger two children, Bralynn F. and Bryan F. (collectively the "Children").[2] On October 1, 2013, the Department of Children's Services ("DCS") was granted an Emergency Protective Custody Order of the Children based on allegations of environmental neglect, drug exposure, and lack of adequate food in the home. At the time the Children were removed, Mother and Jonathan F., who was also living in the home, tested positive for THC, Oxycodone, and Buprenorphine. Subsequently, both Mother and Jonathan F. stipulated to a finding of dependency and neglect.

Over the next several months, DCS and Mother engaged in efforts to reunite Mother with the Children. To this end, at least four permanency plans were created and ratified by the Sullivan County Juvenile Court as orders of the court. These plans set forth requirements for Mother to satisfy before the Children could safely be returned home. For the most part, each new plan reiterated the requirements of the initial plan, but the subsequent plans were updated slightly to reflect the recommendations of Mother's parenting and drug and alcohol assessments. Mother entered into the initial permanency plan on October 23, 2013, and updated plans followed on March 14, 2014, August 27, 2014, and March 12, 2015. In relevant part, the plans included the following requirements for Mother: participate in alcohol and drug assessment and follow recommendations; complete Women's Recovery drug rehabilitation program; submit to and pass random drug screens; provide a safe, stable, child appropriate home; not engage in criminal activity; maintain food and child necessities in the home; demonstrate ability to provide and care for the children; sign releases for all healthcare providers, emergency rooms, and pharmacies; notify DCS of all medical appointments, and notify as soon as possible after emergencies; notify DCS prior to filling any narcotic prescriptions; notify all treating physicians of past drug addiction; provide proof of legal means to financially support the children; provide a reliable means of transportation for herself and the children; and complete a parenting assessment and follow recommendations.

---

[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the children, we will redact the names of individuals sharing the children's surname and will refer to those individuals by their given name and the first letter of their surname.

[2]Subsequent to the filing of the Petition to Terminate Parental Rights, both fathers voluntarily surrendered their parental rights to their respective children. Neither father is a party to this appeal.

Mother was referred to Dr. Helen Lane with Families Free on November 13, 2013, to conduct a parenting assessment. Over the next couple of months, Dr. Lane determined that Mother was borderline mentally challenged and that the risk for neglect for the Children was very high. Mother began parenting education and visitations with the Children as provided through Camelot Care Services ("Camelot"). Initially, Mother's counselor with Camelot was Ms. Brenda Harper. During that time, Mother did well with her parenting skills training, her visits with the Children were consistent, and she was appropriate in her interactions with the Children. Mother completed her alcohol and drug assessment at Frontier Health in November 2013. They recommended that Mother complete the Women's Recovery Services Treatment Program, which consisted of some 60 classes, and Mother completed that program. She completed both her parenting skills program and anger management program in early 2014. Ms. Harper was eventually taken off of Mother's case due to her workload, and Mr. Kyle Gregg replaced her as Mother's counselor with Camelot from March 2014 through the duration of the trial, although he last visited with Mother and the children during June or July of 2015. According to Mr. Gregg, during his time with Mother, she was still having trouble supervising all four children at once.

Mother's visitations went well in the beginning, so in May 2014, DCS began to seek court approval for a trial home pass. However, due to a Child Protective Services ("CPS") investigation, the trial home pass was ultimately delayed until September 2014. Mother was incarcerated from September 24, 2014, until September 25, 2014. The trial home pass then began on September 29, 2014. Mother voluntarily revoked that pass the next day for the younger two children, Bralynn F. and Bryan F., because they were inconsolably crying for their foster mother. Mother told DCS she was having difficulty managing all four children at once. Mother explained to DCS that she would like for the younger two to return to their foster home while she and the older two got acclimated. However, on October 10, 2014, DCS learned that Mother's on-and-off again boyfriend, Mr. Bellew, had been staying in the home and that the police had been called to the home for a domestic violence disturbance in the days prior to the start of the trial home pass. Mother was aware that Mr. Bellew was not approved to be around the children. Therefore, the trial home pass for the two older children was revoked on October 13, 2014.

After the failed trial home pass, Mother lost touch with DCS for a period of time. Mother was incarcerated for public intoxication on January 10, 2015, and released the same day. Eventually, on April 22, 2015, Mother called DCS and admitted to relapsing and using several illegal drugs between November 2014 and April 2015.[3] On August 25,

---

[3]Mother admitted to using subutex, buprenorphine, marijuana, benzodiazepines, roxycodone, methamphetamine, Lortab, Percocet, and crack cocaine.

2015, Mother was incarcerated for failure to pay child support for the Children, and she remained incarcerated throughout the entirety of the trial court proceedings.

DCS filed the Petition to Terminate that is the subject of this appeal on May 28, 2015.[4]  The petition alleged the following grounds for termination: (1) abandonment by willful failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with permanency plan; and (4) persistent conditions.  DCS further alleged that terminating Mother's parental rights was in the best interests of the Children.  The hearing on that petition was held over the course of three days -- October 12, 2015, November 23, 2015, and January 27, 2016.  The trial court ultimately held that DCS had proven by clear and convincing evidence each of the four aforementioned grounds to terminate Mother's parental rights and that termination was in the best interests of the Children.  On February 29, 2016, the Final Decree of Guardianship was filed.  The Mother timely filed a notice of appeal to this Court.[5]

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have restated:

1. Whether the trial court erred in terminating Mother's parental rights on four statutory grounds: abandonment for failure to support, abandonment for failure to provide a suitable home, substantial noncompliance with permanency plans, and persistence of conditions;

2. Whether the trial court erred in finding that terminating Mother's parental rights was in the best interests of the children.

## III. STANDARD OF REVIEW

"In Tennessee, proceedings to terminate a parent's parental rights are governed by statute."  *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015).  Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent."  *Id.* at 546.  Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two

_____

[4]The record does not indicate that Mother ever filed a responsive pleading to the petition to terminate parental rights, but she and her attorney did participate in the hearings on said petition.
[5]The attorney initially appointed for Mother and who represented Mother at trial was permitted to withdraw as counsel for Mother in this matter on March, 7, 2016.  An order appointing Elizabeth Brady as Mother's new attorney was entered on March 9, 2016.  Ms. Brady filed this appeal on Mother's behalf.

elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113. *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* "In light of the constitutional dimension of the rights at stake in a termination proceeding," the persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.    DISCUSSION

### A.  Grounds for Termination

1. Abandonment by an Incarcerated Parent – Failure to Support

The first ground for termination referenced in the trial court's order is the definition of abandonment provided for in Tennessee Code Annotated section 36-1-102(1)(A)(i). Pursuant to that definition, parental rights may be terminated when:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). For purposes of this definition of abandonment, "'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, [that] under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Where a parent is incarcerated for all or part of the applicable four month period, a parent commits abandonment by failing to support the child in the four consecutive months immediately preceding the parent's incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Although not explicitly set forth in the trial court's order, the applicable four month period in this case for failure to support is May 24, 2014 through September 23, 2014.[6] In concluding that Mother "willfully has not supported the children or has made only token payments toward the children's support in the four months right before she was incarcerated," the trial court found the following:

> [Mother] was ordered to pay $50 per month per child in support for the children . . . on March 26th 2014. [Mother] made payments of $200 in the four months preceding September 24th 2014. [Mother] is able-bodied and capable of working and earning enough to support herself as well as paying child support. [Mother] knew the consequences of her failure to support . . . . . [D]uring that time she worked at Popeye's . . . . [Mother] was fired from

---

[6]The petition to terminate was filed on May 28, 2015. Mother was incarcerated on September 24 and 25, 2014, January 10, 2015, and August 25, 2015 through the duration of the trial. Therefore, the four consecutive months immediately preceding Mother's incarceration would be May 24, 2014 until September 23, 2014.

that job for allegedly bringing too much drama to the workplace. . . . [Mother] further testified that she worked at McDonalds . . . . [She] voluntarily quit that job. She was employed and able to be employed during the four months prior to incarceration and was able to make child support payments. The proof shows that [Mother] was not under any physical or mental disability that would have prevented her from working. . . . [D]uring the relevant time frame she paid $50 per month in rent which also covered her utilities, [] she received food stamps sufficient for herself and [] she had no other expenses. . . . Therefore, [Mother] did or could have earned approximately $580 per month, paid her rent and child support and had $100 left over for incidentals. [Mother] only paid $200 of the $800 owed and given [her] age, experience, being able in mind and body, the fact that [she] was employed and was first fired, and then quit her second job the Court finds that the child support she made was merely token given the totality of her circumstances. At the time of trial and of the date of this ruling [Mother] was and is incarcerated for her willful failure to pay child support for these children.

(Numbered paragraphs in original omitted.)

On appeal, Mother argues that she was incapable, not unwilling, to provide support for the Children, and she likens her circumstances to that of the mother in the case of *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004). In that case, this Court determined that DCS failed to present clear and convincing evidence that the mother's failure to financially support her children was willful. *Id.* at 654-55. However, unlike the Mother in this case, this Court found that the mother in *In re M.J.B.* was not aware of her obligation to support her children after they were placed in DCS custody, and the record did not indicate that she was ever ordered to pay child support. *Id.* Furthermore, the court in *In re M.J.B.* determined that the evidence indicated that mother's earnings and available government benefits during the relevant time period did not provide her with the resources to support herself or her children. *Id.* To the contrary, the Mother in this case personally testified that she was aware of her support obligation and the consequences of failing to meet that obligation, and the trial court specifically found that she did or should have had enough income to support herself, make her child support payments, and still have some money left over for incidentals each month.

Having reviewed the record, we conclude that the evidence does not preponderate against the trial court's factual findings on this issue. Moreover, we agree with the trial court's conclusion that this ground for termination was established by clear and convincing evidence.

7

2. Abandonment for Failure to Provide a Suitable Home

The trial court held that DCS also carried its burden of proof with regard to the second substantive ground alleged for termination: abandonment for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii).[7]  DCS, the Appellee, does not seek to defend the suitable-home ground on appeal.  DCS concedes, and we agree, that the trial court impermissibly based its decision in pertinent part on facts outside of the applicable four month period defined in the statute, which would have been four months following the removal of the Children from Mother's home.  The Children were removed on October 1, 2013, and the four months ran from that date until February 1, 2014.  The record does not contain sufficient information regarding the state of Mother's home in the relevant four months in order to affirm termination on that basis. Accordingly, we must reverse the termination on this ground.

3. Substantial Noncompliance with Permanency Plan

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan."  Tenn. Code Ann. § 36-1-113(g)(2).  In terminating parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement."  *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014), *perm. app. denied* (Tenn. Sept. 14, 2014).  "The trial court must then find that the noncompliance is substantial."  *Id.* (citation omitted).  Although the termination statute does not define what conduct

_____

[7]Pursuant to that definition, a parent's parental rights may be terminated when

 (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

8

constitutes substantial noncompliance, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Because determining whether substantial noncompliance exists is a question of law, we review the issue *de novo* with no presumption of correctness. *Id.* at 548.

The trial court found, and we agree, that Mother's permanency plans were reasonably related to remedying the reasons the Children were removed from the home. In concluding that Mother had "not substantially complied with her statement of responsibilities on the permanency plan," the trial court made the following findings in its written ruling terminating Mother's parental rights:

> At first [Mother] did well on the permanency plan and completed an alcohol and drug assessment which required her to complete Women's Recovery, which she did; she got a job; she attended visitation; she had transportation and a valid license; she testified that upon her release she has [a] job lined up at Papa Johns; she completed a parenting skills assessment and anger management; she is currently enrolled in Families Free. . . . [Mother] testified that after completing Women's Recovery and the alcohol and drug assessment she had a relapse for about four or five months . . . . This undid all the good work she had done up to that point [.]

(Numbered paragraphs from original omitted.) Furthermore, the proof at trial showed that Mother was appropriate with her children at visits, including providing food for the Children at the visits. She attended and graduated from the Women's Recovery Program, which consisted of 60 or so classes. Mother also followed the recommendations of her parenting assessment. But the trial court ultimately found that Mother's relapse was fatal to her attempts to comply with the permanency plans.

The trial court improperly based its conclusion that Mother had not substantially complied with the permanency plans on the fact that the outcome and goals of the plans were not reached, rather than on Mother's efforts to comply. This Court has held that "outcome achievement is not the measure of compliance." *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *11 (Tenn. Ct. App. Mar. 2, 2009), *perm. app. denied* (Tenn. May 18, 2009). When considering this ground for termination, "[o]ur focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*) (citing *In re B.D.*, 2009 WL 528922, at *8). Although Mother certainly failed to comply with some requirements of the permanency plan, we cannot agree that Mother's relapse "undid" all of her previous

and subsequent attempts to substantially comply with the requirements of her permanency plans.

In light of the foregoing, we conclude that the evidence preponderates against the trial court's finding that there was clear and convincing evidence of substantial noncompliance with the permanency plans by Mother. We therefore reverse the trial court's finding with respect to this ground.

4. Persistent Conditions

The statutory ground for termination that is commonly referred to as "persistent conditions," is defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). In order to terminate parental rights, there must be clear and convincing evidence of each of these elements. *In re Valentine*, 79 S.W.3d at 550. The purpose behind the "persistent conditions" ground for terminating parental rights is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. *Id.*

The Children were initially put into DCS custody based on Mother and Jonathan F.'s drug abuse, environmental neglect, and a lack of adequate food in the home. Mother stipulated to a finding of dependency and neglect. At the time of the filing of the petition to terminate parental rights, it had been 19 months since the Children were removed from the home, and at the time of the hearing it had been over 2 years. The trial court found that nothing had substantially changed within that period of time to allow for the Children's safe return to the home. The record supports this conclusion. Mother relapsed for a period of several months, she allowed Mr. Bellew to stay in her home despite being told that his incarceration for attempted murder would prevent him from being approved to be around the Children, her trial home pass failed, there had been at least one instance of domestic violence in the home, Mother did not have a home where the Children could live, and she was still incarcerated for failing to financially support the Children at the time of the court's ruling. The trial court further found that there was little chance that these conditions would be remedied soon so that the children could be returned to the home safely, that DCS had made reasonable efforts to help Mother, to no avail, and that to continue "the parent/child relationship [would] greatly diminish the Children's chances of being placed into a safe, stable and permanent home."

We agree with the trial court's conclusion that there was clear and convincing evidence to terminate Mother's parental rights based on this ground.

### B. Best Interests of the Children

Although we find that DCS did not meet its burden of proof with regard to the allegations of failure to provide a suitable home and substantial noncompliance with a permanency plan, only a single statutory ground must be proven in order to support an order for termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005). Because the trial court properly found the existence of at least one statutory ground for termination of Mother's parental rights, we now consider the trial court's finding that terminating Mother's parental rights is in the best interests of the children. Tennessee Code Annotated section 36-1-113(i) sets out a list of factors that are relevant in a best-interest analysis. However, this list of factors is not exhaustive, and a court need not find the existence of every factor for termination. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). This Court has also noted that the "best interests of a child must be determined from the child's perspective and not the parent's." *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010) (citing *White v. Moody,* 171 S.W.3d 187, 194 (Tenn.Ct.App.2004)).

The evidence in this case is clear and convincing that it is in the best interests of the Children that the Mother's parental rights be terminated. The record shows that

although the Children were at one time bonded to Mother, at the time of the last trial home pass the younger two children had formed such a strong bond with their foster mother that they did not want to stay with Mother, and Mother therefore sent them back to their foster mother. Mother has not been able to make lasting changes in her lifestyle or conduct even after DCS made reasonable efforts to help her. Illegal drug use and crime continue to be a running theme in the home. Unfortunately, as the trial court found, Mother's "drug use has rendered her incapable of taking proper care of these children in a safe and stable manner for any extended period of time." Mother has also not paid child support consistently. Moreover, all four children have been placed together in the same pre-adoptive home since they were removed from Mother's home more than two years ago. The Children were doing well at the time of trial and meeting their developmental milestones.

After considering the combined weight of the factual findings supported by the record, it is our view that the trial court, in both its oral and written rulings, properly weighed the statutory best-interest factors in terminating Mother's parental rights.

## IV. CONCLUSION

For the foregoing reasons, we reverse the trial court's order, in part, and affirm the trial court's order terminating Mother's parental rights. Costs of this appeal are taxed to the appellant, Latasha A. Because Latasha A. is proceeding *in forma pauperis* in this appeal, execution may issue for costs, if necessary.

_____
BRANDON O. GIBSON, JUDGE